# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ALEX L. BALISTRERI,

     **Plaintiff,**

     **v.**                                 **Case No. 25-CV-1248-SCD**

FRANK J. BISIGNANO,
  *Commissioner of the Social Security Administration,*

     **Defendant.**

## DECISION AND ORDER REVERSING THE COMMISSIONER'S DECISION

Alex Balistreri seeks social security benefits based primarily on a genetic disorder that caused pain and weakness in his hands and wrists. He also suffered from several mental impairments. After a hearing, an administrative law judge denied the claim for benefits, finding that Balistreri could still work if he avoided (among other things) constant handling and fingering bilaterally.

Balistreri seeks judicial review of that decision under section 205(g) of the Social Security Act, arguing that the ALJ erred in evaluating certain medical opinion evidence and assessing Balistreri's alleged physical limitations. I agree that the ALJ erred when assessing the opinions of the examining state-agency physician and Balistreri's treating orthopedic surgeon, that the ALJ's subjective-symptom evaluation lacks logical support in the record, and that the ALJ failed to provide a good explanation for rejecting the opinion of the agency's own examining psychologist. Accordingly, I will reverse the decision denying Balistreri disability benefits and remand the matter for further proceedings.

In 2022, Balistreri applied for supplemental security income under Title XVI of the Social Security Act, claiming that he was unable to work due to a genetic hand disorder. *See* R. 201–07, 231–38.[1]

## I. Personal and Medical History

Balistreri was born in 2003 with a hole in his heart. R. 310. He was diagnosed with Holt-Oram syndrome (a.k.a. heart-hand syndrome), a rare genetic disorder that "manifests itself in multiple physical disabilities including deformed limbs and heart and respiratory problems," *Laura V. v. Providence Sch. Bd.*, 680 F. Supp. 66, 67 (D.R.I. 1988). R. 490. Balistreri had the hole surgically repaired when he was just a couple months old. R. 310, 454, 490. A few months after the surgery, he was adopted by his aunt. R. 311.

Balistreri came out as transgender during middle school. R. 727. (He was born a biological female.) He was constantly bullied by his classmates, and at age thirteen, he started therapy for depression and anxiety. *See* R. 498–99, 504–05, 719, 727. Balisteri attended counseling off and on as a teenager. *See* R. 321–49, 719. He also tried antidepressant medications, but he felt worse when he was on them than when he wasn't. *See* R. 48, 383, 499, 719. When Balistreri was fifteen, he started gender-affirming care. *See* R. 334, 478–81. However, he struggled drawing up a syringe and administering testosterone injections.

As a teenager, Balistreri frequently complained about pain in his upper extremities. *See* R. 351. X-rays revealed extra and deformed bones in both hands and wrists. R. 304. When Balistreri was sixteen, he got a job at a movie theater handling tickets, cleaning bathrooms, and stocking counters. *See* R. 50, 213, 500, 525. The repetitive movements caused too much

---

[1] The transcript is filed on the docket at ECF No. 12-1.

pain, however, and he quit after just three months on the job. Balistreri also struggled in school, both socially and physically, and despite teachers letting him type all his assignments. R. 38–39. He completed the last few years of high school online and graduated in 2021. *See* R. 38–39, 234–35, 311, 499.

After graduating, Balistreri got a job at Goodwill sorting and pricing items. *See* R. 49–50, 214, 310. He also started seeing an orthopedic hand surgeon, Anthony LoGiudice. *See* R. 351–52. In November 2021, Balistreri told Dr. LoGiudice that the job at Goodwill aggravated his upper-extremity symptoms. Balistreri exhibited some reduced range of motion and mild tenderness upon examination, and x-rays revealed skeletal deformities in his wrists. Dr. LoGiudice observed that there weren't very good treatment modalities for Holt-Oram syndrome. He recommended conservative management, including over-the-counter medications, wrist splints, heat/cold, and frequent rest. Dr. LoGiudice also discussed Balistreri's ability to work, writing, "At this time we think it is reasonable that he is pursuing disability as he has a chronic risk condition that does preclude him from being able to complete many jobs especially any that could include manual labor or use of his wrist." R. 352.

Around that same time, Balistreri resumed individual counseling. *See* R. 310–18. He told his therapist that he began feeling depressed in middle school and that he struggled with social anxiety. Upon examination, Balistreri exhibited normal speech, an appropriate mood and affect, logical thought processes, normal thought content, realistic judgment, and normal insight. R. 307–08. He was oriented, had normal recent and remote memory, demonstrated normal attention span and concentration ability, had a normal fund of knowledge, appeared

3

cooperative, and showed no signs of psychomotor agitation, retardation, or bizarre behavior. The therapist diagnosed major depressive disorder and generalized anxiety disorder.

A few months later, Balistreri quit his job at Goodwill. *See* R. 49–50, 490, 520.

Despite not working, Balistreri continued to complain about pain in his hands, shoulders, and chest. *See* R. 363–69, 417–33. He exhibited full range of motion in his shoulders and 5/5 strength and normal sensation in his hands at a physical exam in January 2023. R. 357. Balistreri participated in physical therapy, was advised to wear wrist braces, and was referred to a hand specialist. *See* R. 354–59, 450–59, 572–78. After he reported no relief with wrist braces, Balistreri underwent a nerve conduction study, which did not reveal any remarkable abnormalities. *See* R. 562–68.

In May 2023, Balistreri attended a consultative physical examination with Kurt Reintjes, a physician paid by the state agency charged with reviewing disability applications on behalf of the Social Security Administration. *See* R. 490–97. Dr. Reintjes noted that Balistreri had "common findings that are seen in Holt-Oram"—upper limb defects that cause weak wrists and hands. R. 490. Balistreri said he left his job at Goodwill because the pain in his hands prevented him from meeting production requirements, and he described the pain as unpredictable. Upon examination, Balistreri demonstrated full range of motion in his bilateral upper extremities, with symmetric strength of 5/5 against resistance; bilateral grip strength of 5/5; and bilateral pinch strength of 5/5, with full range of motion of the wrists and hands. R. 491. Dr. Reintjes did not observe any anatomic abnormalities aside for thinning musculature and tone of bone hands. He noted that Balistreri was able to fill out the questionnaire with very legible handwriting and without any indications of fatigue, that

4

Balistreri demonstrated intact dexterity for both fine and gross movements, and that Balistreri's upper extremities were neurovascularly intact.

Based on the exam findings, Dr. Reintjes assessed Holt-Oram syndrome "likely with rapid fatiguability in both hands." R. 491. He indicated that "[a]ny type of heavy and exertional activity very well could be fatiguing and should be paced, though dexterity appeared to be completely within normal limits." *Id.* He also opined that "instrumentation such as playing guitars or grasping objects such as drumsticks or twisting bottle caps on a repetitive basic very well could be very difficult for [Balistreri]." *Id.* However, he noted that, during the exam, Balistreri exhibited full strength throughout with intact dexterity, Balistreri did not demonstrate any cardiovascular anomalies, and all other findings were within normal limits.

The following week, Balistreri attended a consultative psychological examination with Brittany Simon. *See* R. 498–503. Balistreri told Dr. Simon that he struggled with depression, anxiety, and being around other people. R. 498. He said he tried working, but he had difficulty functioning, he struggled asking for help, and he frequently called off. R. 500. During the mental status exam, Balistreri was cooperative, stayed on topic, and seemed able to follow simple instructions. R. 501. He demonstrated logical and goal-directed thought processes, was estimated to have average intelligence, exhibited normal speech, was oriented, had good immediate recall, demonstrated average fund of information, had no difficulty following the conversation, and exhibited good abstract thinking, insight, and judgment. R. 501–02. However, Dr. Simon noted that Balistreri showed signs of psychomotor retardation, appeared to be anxious and depressed, and exhibited evidence of recent memory issues.

5

Dr. Simon diagnosed several mental impairments. R. 502. According to Dr. Simon, Balistreri could understand simple work instructions and had only mild issues with judgment. But she said Balistreri's ability to carry out tasks would be compromised by his moderate difficulty with concentration, attention, and work pace; Balistreri likely would have marked difficulty interacting with co-workers and supervisors; Balistreri likely would have moderate deficits in exhibiting mental control; and Balistreri likely would have marked difficulty adapting to stressors on the job.

Throughout 2023 and 2024, Balistreri continued to seek treatment for his upper-extremity issues. *See* R. 517–30, 557–60, 597–602, 646–47, 712–15. In October 2023, he reported increased pain with any sort of use of his hands and wrists. R. 518. Orthopedic testing revealed that Balistreri had ten pounds of grip strength and three to five pounds of pinch strength. R. 524. The occupational therapist who performed the testing indicated that Balistreri's significantly decreased strength and coordination supported his reported deficits with functional activities. R. 525. Dr. LoGiudice also conducted his own exam, which revealed tenderness to palpation in Balistreri's wrists and muscle wasting in the webspace of both his hands. R. 518–19. Based on that testing, and x-rays that continued to demonstrate bone deformities, Dr. LoGiudice reiterated that Balistreri had a chronic risk condition that precluded him from being able to complete many jobs, especially those involving manual labor or the use of his wrists. R. 517, 529.

Balistreri returned to Dr. LoGuidice in May 2024 complaining about increased pain in his wrists. R. 712. He said he recently started a new job at Walgreens and noticed significant debilitating pain any time he worked more than five hours every other day. Based on those subjective reports, as well as a physical exam and updated imaging results, Dr. LoGiudice

6

recommended that Balistreri avoid jobs involving manual labor or repetitive use of the wrists and work no more than five hours every other day. *See* R. 712–13.

Balistreri also continued to attend psychological counseling. *See* R. 504–12, 716–23. During mental status exams, he exhibited a depressed and anxious mood and impaired remote memory but no other abnormal findings. Balistreri's therapist completed a questionnaire in September 2024 indicating that Balistreri was significantly limited in several areas of mental functioning. *See* R. 729–33.

## II.     Administrative Proceedings

Balistreri applied for disability benefits on March 23, 2022. *See* R. 15, 201–07. He alleged that he was disabled as of that date (when he was nineteen years old) due to Holt-Oram syndrome. *See* R. 231–38. In his application materials, Balistreri reported that he had constant pain in his hands and wrists that caused difficulty lifting, writing, and grasping items. *See* R. 239–46. He said he managed his personal care activities despite the pain; he made simple meals like frozen dinners and sandwiches; he did some laundry and dusting; he was able to drive; and he enjoyed reading, watching television, and playing computer games. Balistreri asserted that his impairments affected his ability to lift, reach, remember, complete tasks, concentrate, and use his hands. He indicated that he had a five-pound lifting restriction, that he could pay attention up to two hours, that he had no issues getting along with authority figures, and that he struggled handling stress. Balistreri said that writing was difficult for him, so he had his mom transcribe his answers.

The state agency denied Balistreri's claim upon its review of the available medical records. *See* R. 59–83. The reviewing physicians, Mina Khorshidi and Dorothy Leong, found

that Balistreri could perform a restricted range of light work.[2] R. 64–65, 77–80. Relevant here, Dr. Khorshidi and Dr. Leong found that Balistreri was limited to frequent[3] handling (gross manipulation) and fingering (fine manipulation).

The state agency also assessed Balistreri's mental impairments. The reviewing psychologists, Samantha Lavarda and Carol Mohney, found that Balistreri's depression and anxiety did not significantly limit his mental ability to do basic work activities. R. 61–62, 66–68, 74–75, 80–81. Specifically, Dr. Lavarda and Dr. Mohney found that Balistreri had a moderate limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing himself.[4] Dr. Lavarda and Dr. Mohney found that, overall, Balistreri retained the mental capacity to concentrate on, understand, and remember routine, repetitive instructions; could maintain attention to carry out short, simple tasks for two hours at a time with normal breaks in an eight-hour day; could not perform fast-paced work or work that had strict production quotas; could maintain occasional contact with the general public, supervisors, and co-workers; would have difficulty asking detailed or complex questions; was capable of asking simple questions and requesting

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b).

[3] "'Frequent' means occurring from one-third to two-thirds of the time." Social Security Ruling (SSR) 83-10, Titles II and XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, 1983 WL 31251, 1983 SSR LEXIS 30, at *14 (Jan. 1, 1983).

[4] These four areas of mental functioning are known as the "paragraph B" criteria. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E). The paragraph B criteria are measured on a five-point scale: none, mild, moderate, marked, and extreme. See id. § 12.00(F)(2). "Moderate" means that the claimant's functioning "independently, appropriately, effectively, and on a sustained basis is fair." Id. § 12.00(F)(2)(c).

assistance; and was suitable for work that did not require challenging tasks from day-to-day, but rather that had a regular set of job duties and expectations.

After the state-agency denial, Balistreri had a hearing with an ALJ. *See* R. 32–58. Balistreri told the ALJ that he last worked at Walgreens as a cashier, managing one four-hour shift a week. R. 44–45. He said he quit after just one month because the pain in his hands was awful and he couldn't greet customers. Prior to that, he worked part-time at Barnes and Noble, Goodwill, and a movie theater, but those jobs were also short-lived. R. 42–43, 49–50. He indicated that he was let go from Barnes and Noble because he wasn't outgoing enough. Balistreri claimed that he couldn't work anymore due to constant pain in his hands and wrists and difficulty concentrating. R. 42–44, 47–48. He said he tried various treatments for his upper-extremity issues, but nothing helped. Balistreri told the ALJ that he wasn't taking any medications for his mental health issues; however, he saw a therapist twice a month. R. 48.

Balistreri also testified about his daily activities. He told the ALJ that he enjoyed creative writing, reading, and watching television. R. 40–41, 45. He said he wrote stories on the computer using a mix of typing and talk-to-type software. According to Balistreri, he could write for no more than sixty minutes at a time and four hours a day, read for thirty minutes a day, and watch TV for up to four hours a day. He indicated he rarely socialized with friends, but he did play turn-based video games (like Wii Party) with them. R. 45–46. Balistreri told the ALJ that he tried dusting once a week, that he rarely performed other household chores, that he made only microwave meals, and that he needed help carrying groceries. R. 41. He said he couldn't exercise, and he could drive for only twenty minutes before the pain in his hands and wrists became too unbearable. R. 46–47.

A vocational expert also testified at the hearing. *See* R. 51–57. According to the expert, a hypothetical person with Balistreri's age and vocational profile could work as a merchandise maker, a collator operator, and a routing clerk if he were limited to a restricted range of light exertional work, including frequently handling and fingering objects bilaterally. R. 52–53. The vocational expert testified that few jobs would be available if that same person could only occasionally[5] handle and finger. R. 54–55. Similarly, the vocational expert testified that being off task fifteen percent or more of the workday or missing two or more days per month would be work-preclusive. R. 56.

In December 2024, the ALJ issued a written decision finding that Balistreri was not disabled. *See* R. 12–31. The ALJ considered the disability application under 20 C.F.R. § 416.920, which sets forth a five-step process for evaluating SSI claims. *See* R. 15–26. Relevant here, the ALJ determined at step two of that process that Balistreri had three severe impairments: Holt-Oram syndrome, anxiety disorder, and an affective disorder. R. 17–18. The ALJ determined at step three that Balistreri did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in the social security regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 18–19. In making that determination, the ALJ agreed with the reviewing state-agency psychologists that Balistreri had a moderate limitation in each of the four paragraph B criteria.

Between steps three and four, the ALJ assessed Balistreri's residual functional capacity—that is, the most he could do despite his physical and mental limitations, *see* 20

---

[5] "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10, 1983 SSR LEXIS 30, at *13.

C.F.R. § 416.945(a). The ALJ determined that Balistreri had the RFC to perform a restricted range of light work. R. 19. According to the ALJ, Balisteri could frequently handle and finger bilaterally and could occasionally crawl and climb ladders, ropes, and scaffolds. The ALJ also assessed several mental limitations. Specifically, the ALJ found that Balistreri could understand, remember, and carry out simple instructions; could perform simple, routine tasks in a position having only occasional changes; could not perform fast-paced tasks with hourly production quotas; could maintain concentration, persistence, and pace for simple tasks in two-hour increments over the course of a normal workday and workweek; and could tolerate only occasional interaction with the public, co-workers, and supervisors.

In assessing that RFC, the ALJ considered Balistreri's subjective allegations, the objective medical evidence, and the medical opinion evidence. *See* R. 19–24. The ALJ first summarized Balistreri's allegations, observing that he claimed he was unable to work due primarily to wrist pain that limited his ability to repetitively use his hands. *See* R. 20. The ALJ then summarized the objective medical evidence, noting that Balistreri had a history of skeletal deformities in his hands and wrists and had been assessed with Holt-Oram syndrome. The ALJ also discussed in detail the May 2023 consultative exam with Dr. Reintjes and the October 2023 doctor visit. *See* R. 21 (citing Exhibits 8F; 9F; 13F). And the ALJ briefly mentioned Balistreri's mental health treatment, including the consultative exam with Dr. Simon. *See* R. 21 (citing Exhibits 2F; 10F; 11F; 14F; 18F).

According to the ALJ, Balistreri's statements concerning the intensity, persistence, and limiting effects of his symptoms were inconsistent with the overall record. *See* R. 21–22. The ALJ observed that, despite consistent complaints of wrist pain, Balistreri had few positive clinical findings at the consultative exam. The ALJ also observed that Balistreri required very

11

minimal medical care for his symptoms and engaged in activities—like driving, playing video games, filling out a questionnaire, and writing mystery novels—suggesting greater functional abilities. As for Balistreri's mental impairments, the ALJ noted that the mental status exams were essentially normal, that Balistreri did not take medication for his mental health symptoms, and that Balistreri had attended only a few therapy sessions. The ALJ also noted that Balistreri worked at Barnes and Noble over the holidays and that he was let go because he was not outgoing enough.

Finally, the ALJ considered the medical opinion evidence. The ALJ found persuasive the prior administrative medical findings of the reviewing state-agency consultants. R. 22–23. The ALJ determined that Dr. Reintjes's opinions were only partially persuasive because they were not entirely supported by his own examination and because they were inconsistent with other evidence in the record. R. 23. The ALJ found Dr. Simon's opinions to be of little persuasive value, as they were not well-supported by her own evaluation and were inconsistent with other evidence. Similarly, the ALJ determined that Dr. LoGiudice's opinions were worthy of little persuasive value because they were not well-supported, they were vague, they appeared to be based on Balistreri's self-reported limitations, they were inconsistent with the objective exam findings, they contrasted with the other doctors' opinions, and the determination about Balistreri's ultimate ability to work was an issue reserved for the Commissioner. R. 23–24.

The ALJ then continued with the sequential evaluation process. The ALJ determined at step four that Balistreri did not have any past relevant work. R. 24. At step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Balistreri could still perform. R. 24–25. The ALJ, relying on the vocational expert's

12

testimony, listed three representative jobs: merchandise marker, collator operator, and routing clerk. Based on the step-five finding, the ALJ determined that Balistreri had not been disabled at any time since he applied for disability benefits on March 23, 2022. R. 25–26.

The Social Security Administration's Appeals Council denied Balistreri's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). This action followed. *See* Compl., ECF No. 1.

## LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the

13

claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Balistreri seeks remand for rehearing, arguing that the ALJ committed reversible legal error at steps three and five of the sequential evaluation process. He raises three issues. First, Balistreri contends that the ALJ failed to adequately consider the persuasiveness of medical opinion evidence concerning his upper-extremity limitations. Second, according to Balistreri, the ALJ mischaracterized the record when evaluating his subjective allegations. Third, Balistreri maintains that the ALJ failed to provide a good explanation for rejecting the opinion of an examining psychologist.[6]

## I.   The ALJ Erred in Evaluating Certain Medical Opinion Evidence Concerning Balistreri's Physical Limitations

Because Balistreri applied for disability benefits on or after March 27, 2017, the ALJ applied the new social security regulations for evaluating medical opinions and prior administrative medical findings. *See* R. 19–20 (citing 20 C.F.R. § 416.920c). Under the new regulations, the ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 416.920c(a). Rather, the ALJ must consider the persuasiveness of all medical opinions and prior administrative medical findings in the record using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors

---

[6] All parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3 & 5.

that tend to support or contradict a medical opinion or prior administrative medical finding. *See* 20 C.F.R. § 416.920c(c).

Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. 20 C.F.R. § 416.920c(a), (b)(2). The supportability factor focuses on what the source brought forth to support his or her findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). The consistency factor, on the other hand, compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion and prior administrative medical finding in the record. § 416.920c(b)(2). The ALJ may, but doesn't need to, explain how he considered the other three factors. *Id.*

Balistreri challenges the ALJ's evaluation of the medical opinions offered by Dr. Reintjes (the consultative examining physician) and Dr. LoGuidice (Balistreri's treating orthopedic surgeon). *See* Pl.'s Br., at 9–15, ECF No. 16.

### A.    Dr. Reintjes

Dr. Reintjes was paid by the state agency to examine Balistreri's physical impairments and author a report of his findings. *See* R. 490–97. In the "impression" section of his report, Dr. Reintjes indicated that Balistreri likely would have rapid fatigability in both hands, that

15

any type of heavy and exertional activity should be paced, and that grasping or twisting objects on a repetitive basis could be very difficult for Balistreri. R. 491. The ALJ found Dr. Reintjes's opinions to be "partially persuasive" because they were not entirely supported by the doctor's own examination and because they were inconsistent with Balistreri's activities. R. 23. Balistreri argues that both reasons are fatally flawed; I agree.

Start with consistency. The ALJ implied that Dr. Reintjes conceded his opinions conflicted with his own exam findings. But that's not what the report says. Dr. Reintjes acknowledged that, upon examination, Balistreri exhibited 5/5 strength throughout, demonstrated intact dexterity for both fine and gross movements, and did not display any cardiovascular anomalies. R. 491. Despite those findings, Dr. Reintjes assessed several limitations in prolonged or repetitive use of the hands and wrists. Because, as Dr. Reintjes concluded, Balistreri's main issue was fatigability, it's unsurprising that immediate signs of weakness would not be detected during a short exam. Moreover, when assessing Dr. Reintjes's opinions, the ALJ failed to mention that Balistreri's primary concern—weak wrists and hands—were "common findings" seen in Holt-Oram syndrome and that Dr. Reintjes observed "thinning musculature and tone of both hands." R. 490–91. Those findings appear to support Dr. Reintjes's opinion that repetitive use of the hands would be fatiguing for Balistreri.

The ALJ also failed to explain *how* the activities he mentioned were inconsistent with Dr. Reintjes's opinions. He noted that Balistreri drove, played video games, wrote books, and filled out a questionnaire with very legible handwriting and without any signs of fatigue. R. 23. However, the ALJ failed to acknowledge Balistreri's reported limitations in those activities. Balistreri testified that driving was too painful after about twenty minutes; that he

16

could play a turn-based video game (like Wii Party) for forty-five minutes; and that he could write for twenty to sixty minutes at a time before needing at least a thirty-minute break and up to four hours a day using a mix of typing and talk-to-text software. *See* R. 40, 45–47. Those qualifications appear consistent with Dr. Reintjes's opinion that, while Balistreri did not have deficits using his hands for short periods of time, he would struggle with prolonged use. And it was Dr. Reintjes who remarked on Balistreri's ability to complete the questionnaire, yet he still believed Balistreri could not repetitively use his hands. *See* R. 491. The ALJ didn't explain how filling out a single medical form was incompatible with that opined limitation.[7]

### B.    Dr. LoGiudice

Dr. LoGiudice is an orthopedic surgeon and hand specialist who treated Balistreri since at least November 2021. *See* R. 351–52, 471–77. Dr. LoGiudice repeatedly indicated that it was reasonable for Balistreri to be pursuing disability because he had a chronic risk condition (Holt-Oram syndrome) that precluded him from being able to complete many jobs, especially those involving manual labor or repetitive use of his wrists. *See* R. 352, 472, 517, 529, 646, 673, 713–15. He also recommended that Balistreri work no more than five hours every other day. R. 714. The ALJ found Dr. LoGiudice's opinions to be "of little persuasive value" because they were not well-supported, they were vague, they did not include any specific limitations, they appeared to be based on Balistreri's self-reported limitations, and they were inconsistent with other evidence in the record, including normal physical exam findings and the opinions of Dr. Reintjes, Dr. Khorshidi, and Dr. Leong. R. 23–24. The ALJ also noted that a determination about a claimant's ultimate ability to work is an issue reserved

---

[7] The Commissioner says that Balistreri also was able to neatly hand-write his February 2023 function report. *See* Def.'s Mem., at 10, ECF No. 24 (citing R. 239–46). But that wasn't a reason the ALJ offered for discounting Dr. Reintjes's opinions. *See* R. 23. It's also not true—Balistreri indicated on the report that he had his mom complete the form for him because "writing is hard." R. 246.

17

for the Commissioner. Balistreri takes issue with each of the reasons the ALJ offered for rejecting Dr. LoGiudice's medical opinions.

When evaluating Dr. LoGiudice's opinions, the ALJ failed to explain why or cite any record evidence to substantiate his conclusion that those opinions were not well-supported. The Commissioner blames Dr. LoGiudice for this shortcoming, insisting that he's the one who failed to "specify *any* supportive clinical or objective evidence." Def.'s Mem., at 12. But Dr. LoGiudice did indicate that his opinions about Balistreri's work-related functioning were "based on global wrist pain described by [Balistreri] and on clinical exam due to underlying Holt-Oram Syndrome." R. 714. The ALJ, however, never mentioned that supporting explanation.

The ALJ also failed to seriously consider the underlying objective medical evidence presented by Dr. LoGiudice. *See* § 416.920c(c)(1). For example, in November 2021, Dr. LoGiudice noted that x-rays revealed bone deformities in Balistreri's hands and wrists and either a loose body or an underdeveloped wrist bone. R. 351–52. After Balistreri complained about increased pain with any sort of activity, Dr. LoGiudice referred him for occupational testing to get objective baseline measurements of his functional abilities. *See* R. 523. Balistreri completed the testing in October 2023 and, upon examination, he demonstrated just ten pounds of grip strength and three to five pounds of pinch strength. *See* R. 523–26. The occupational therapist who performed the testing explained that twenty pounds of grip strength and five pounds of pinch strength were considered functional for self-care activities. According to the occupational therapist, Balistreri's significantly decreased strength and coordination supported his self-reported functional deficits.

Dr. LoGiudice included the occupational testing results in his own treatment notes. *See* R. 518–22, 527–30. He also conducted his own physical examination, which revealed tenderness to palpation and muscle wasting in the webspace of Balistreri's hands, and he reviewed updated x-rays that continued to show bone deformities in Balistreri's wrists. In other words, Dr. LoGiudice did not rely solely on Balistreri's self-reported complaints or invent limitations out of whole cloth. He based his opinions on his own exams and his review of other diagnostic evidence. Although, as the Commissioner points out, the ALJ briefly mentioned some of that evidence earlier in his decision, *see* Def.'s Mem., at 12 (citing R. 22, 24), he never explained why that same evidence did not support Dr. LoGiudice's opinions.

The ALJ similarly failed to explain or support his conclusion that Dr. LoGiudice's opinions were inconsistent with other evidence in the record. The ALJ noted that Balistreri consistently demonstrated full strength and range of motion at "most" appointments. R. 24. That observation, however, means that Balistreri exhibited reduced strength or range of motion at others. But the ALJ didn't explain why the positive exam findings outweighed the diminished ones. An explanation is especially critical here, as it was during focused, specialized testing when Balistreri demonstrated a "[s]ignificant decrease in strength and coordination," R. 525. Also, the ALJ didn't explain how Dr. LoGiudice's opinion that Balistreri couldn't perform jobs involving repetitive use of his wrists was somehow inconsistent with Dr. Reintjes's opinion that repetitive use of the hands and wrists would be very difficult for Balistreri.

The ALJ committed other errors when evaluating Dr. LoGiudice's opinions. Dr. LoGiudice did not, as the ALJ implied, indicate that Balistreri was unable to work. *See* R. 24 (citing 20 C.F.R. 416.920b(c)). Rather, he offered a specific recommendation—no more than

five hours of work every other day—based on Balisteri's demonstrated fatigability with repetitive use of his hands and "patient trial and error." R. 714. The ALJ also did not appear to consider the nature and extent of Dr. LoGiudice's treatment relationship with Balistreri, *see* 20 C.F.R. § 416.920c(c)(3), or that Dr. LoGiudice was a hand specialist, *see* 20 C.F.R. § 416.920c(c)(4).

*      *      *

The Commissioner argues that the ALJ reasonably favored the prior administrative medical findings of the non-examining state-agency consultants over the opinions of Dr. Reintjes and Dr. LoGiudice. *See* Def.'s Mem., at 7–12. Based on their review of the medical records available at the time, Dr. Khorshidi and Dr. Leong found that Balistreri could frequently handle and finger bilaterally. R. 65, 78. The Seventh Circuit, however, has held that "a contradictory opinion of a non-examining physician does not, by itself, suffice" to reject the opinion of an examining physician. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)); *see also Beardsley*, 758 F.3d at 839 ("The problem in this case is that the ALJ did not provide a valid explanation for preferring the record reviewer's analysis over that of the agency's examining doctor."); 20 C.F.R. § 416.920c(c)(3)(v) ("A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder."). As explained above, substantial evidence does not support the ALJ's decision to find the reviewing physicians' findings more persuasive than those of the state-agency examining physician or Balistreri's treating hand specialist. Moreover, both reviewing physicians found Dr. Reintjes's opinions to be persuasive, Dr. Khorshidi issued her findings

20

before the October 2023 functional testing, and Dr. Leong largely ignored the occupational therapist's findings. *See* R. 63–66, 76–80.

Balistreri's ability to use his hands and wrists is key to his ability to work. He claimed that weak hands and wrists were his primary concern, and he said he struggled with repetitive movements at his previous jobs. *See* R. 42–45, 49–50, 490. The vocational expert testified that Balistreri could still work if he were limited to frequent handling and fingering of objects bilaterally, but he identified few jobs that could be performed if that restriction were reduced to occasional handling and fingering. R. 52–56. In other words, Balistreri likely would have been found disabled if the ALJ had been more persuaded by the opinions of Dr. Reintjes or Dr. LoGiudice.

## II. The ALJ's Subjective-Symptom Evaluation Lacks Logical Support in the Record

Balistreri alleged that he was unable to work due to Holt-Oram syndrome, which resulted in hand and wrist pain and the inability to repetitively use his hands. *See* R. 47–48, 231–46. The ALJ determined that Balistreri's statements about the intensity, persistence, and limiting effects of his alleged symptoms were inconsistent with the overall record. R. 21. According to the ALJ, Balistreri exhibited few positive clinical findings at the consultative exam, required very minimal medical care for his symptoms, engaged in activities suggesting greater functional abilities, and was let go from his job at Barnes and Noble because he wasn't outgoing enough. R. 21–22. Balistreri challenges the reasons the ALJ offered for discrediting his alleged physical symptoms, arguing that the ALJ dramatically mischaracterized the record. *See* Pl.'s Br., at 15–18.

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Ruling No. 16-3p, Policy Interpretation Ruling Titles II and XVI:

21

Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016) (citing 20 C.F.R. § 416.929). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. At the second step, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* (citing *Murphy*, 759 F.3d at 816). "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record.'" *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

Just as with Dr. Reintjes's opinions, the ALJ simply listed activities without explaining *how* they were inconsistent with Balistreri's alleged symptoms. The ALJ noted that Balistreri could drive, play video games, and write books. R. 22. However, the ALJ completely ignored

22

Balistreri's reported limitations in those activities. *See* R. 40, 45–47. The ALJ also noted that Balistreri filled out the consultative examination questionnaire with legible handwriting and without any signs of fatigue. R. 22. But the ALJ didn't explain how completing a single medical form was incompatible with Balistreri's allegation that he couldn't repetitively use his hands and wrists due to pain and weakness.

The Commissioner insists that I can ignore the ALJ's (deficient) description of Balistreri's reported activities because the other reasons he offered for discounting Balistreri's alleged symptoms were sound. *See* Def.'s Mem., at 13–14. I disagree. While the ALJ noted that Balistreri exhibited full strength and range of motion and intact dexterity at the consultative exam, he failed to explain why those findings outweighed the significantly reduced strength and coordination Balistreri demonstrated during occupational testing *See* R. 517–29. The record also does not support the ALJ's characterization of Balistreri's medical care as minimal. Balistreri consistently sought treatment for his upper-extremity issues, Dr. LoGiudice repeatedly explained that there were "very few good treatment modalities" for Holt-Oram syndrome, and Dr. LoGiudice noted that Balistreri had failed conservative treatment. *See, e.g.*, R. 351–52, 354, 383, 425–26, 490, 517–18, 529, 557, 712–15. In other words, there really wasn't any other care available for Balistreri's to pursue. And although Balistreri testified that he was told he was let go from Barnes and Noble because he wasn't outgoing enough, he also described struggles shelving books, bagging items, and dropping change. *See* R. 42–43.

Because the ALJ overstated Balistreri's reported activities and largely ignored other significant evidence, his decision not to credit Balistreri's upper-extremity symptoms lacks support in the record.

23

**III.  The ALJ Failed to Provide a Good Explanation for Rejecting Dr. Simon's Opinions**

Dr. Simon was paid by the state agency to examine Balistreri's mental impairments. *See* R. 498–503. After completing her exam, Dr. Simon opined (among other things) that Balistreri likely would have marked difficulty interacting with co-workers and supervisors and adapting to stressors on the job. R. 502. The ALJ found Dr. Simon's opinions to be "of little persuasive value" because they were not well-supported by her evaluation and because they were inconsistent with other evidence in the record. R. 23. The ALJ also indicated that Dr. Simon appeared to rely heavily on Balistreri's subjective report of symptoms and limitations. Balistreri challenges each reason the ALJ offered for rejecting Dr. Simon's medical opinions. *See* Pl.'s Br., at 18–21.

Consultative examiners are "unlikely . . . to exaggerate an applicant's disability." *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). "As a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence." *Beardsley*, 758 F.3d at 839. "[B]ut *rejecting* the opinion of an agency's doctor that supports a disability finding is 'unusual' and 'can be expected to cause a reviewing court to take notice and await a good explanation.'" *Jones v. Saul*, 823 F. App'x 434, 439 (7th Cir. 2020) (quoting *Beardsley*, 758 F.3d at 839).

The ALJ here failed to provide a good explanation for his unusual step of rejecting Dr. Simon's opinions. First, the ALJ cherry-picked evidence to support his conclusion while ignoring evidence that contradicted it. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." (citing *Villano v. Astrue*, 556

24

F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004))). The ALJ observed that, during the evaluation, Balistreri demonstrated good insight and judgment, was able to respond correctly to the scenarios given, attended alone, maintained concentration, and built rapport with Dr. Simon on their first meeting. R. 23. But the ALJ never mentioned various abnormal findings, including that Balistreri showed signs of psychomotor retardation (i.e., a blunted affect and a quiet and flat voice), appeared to be anxious and depressed, and exhibited evidence of memory issues. *See* R. 501–02. Although the ALJ did acknowledge other abnormal mental status findings elsewhere in his decision, *see* R. 21 (citing Exhibit 10F), he failed to explain why those findings did not support Dr. Simon's opinion that Balistreri had marked difficulties interacting and adapting.

Second, "it's illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms." *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016). "[A] psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning." *Id.*; *see also Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) ("Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise." (citing *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015))); *Thompson v. Berryhill*, 722 F. App'x 573, 581 (7th Cir. 2018) ("[T]he ALJ's statement is inconsistent with the rule that opinions derived from subjective reports are not automatically suspect." (citing *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015))). Here, Dr. Simon rendered her opinion after interviewing Balistreri, observing him, and documenting several signs and symptoms of mental disorders. The fact that Dr. Simon

relied on Balistreri's subjective reports was both expected and necessary, not a reason to question her professional judgment.

Finally, the ALJ erred by discounting Dr. Simon's opinions in favor of the non-examining state-agency psychologists, Dr. Lavarda and Dr. Mohney. *See Thompson*, 722 F. App'x at 581–82. As explained above, the contradictory opinion of a non-examining psychologist generally is not enough to reject the opinion of an examining psychologist. *See Gudgel*, 345 F.3d at 470; *Beardsley*, 758 F.3d at 839; § 416.920c(c)(3)(v). Dr. Lavarda and Dr. Mohney found that Balistreri had only moderate limitations in interacting with others and adapting. *See* R. 61–62, 66–68, 75, 80–81. The ALJ determined that the reviewing psychologists' findings were persuasive because (among other reasons) they were "consistent with *some* of the consultative examination findings." R. 23 (emphasis added). But that reasoning begs the question: What about the other consultative exam findings? The reviewing psychologists also committed the same error of logic as the ALJ, finding that Dr. Simon relied heavily on Balistreri's subjective report of symptoms and limitations. *See* R. 63–64, 77.[8] Thus, substantial evidence does not support the ALJ's decision to find the reviewing psychologists' findings more persuasive than those of the state-agency examining psychologist.

**CONCLUSION**

In sum, the ALJ erred when assessing the opinions of the examining state-agency physician and Balistreri's treating orthopedic surgeon, the ALJ's subjective-symptom evaluation lacks logical support in the record, and the ALJ failed to provide a good explanation for rejecting the opinion of the agency's own examining psychologist.

---

[8] It bears mentioning that the ALJ's "analysis" is nearly identical to the reviewing consultants' discussion of the evidence, almost as if he copied their findings and pasted them in his final decision. *Compare* R. 20–24 *with* R. 74–81.

Accordingly, for all the foregoing reasons, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

    **SO ORDERED** this 18th day of June, 2026.

STEPHEN C. DRIES
United States Magistrate Judge

Case 2:25-cv-01248-SCD    Filed 06/18/26    Page 27 of 27    Document 29